## UNITED STATES DISTRICT COURT
### FOR THE
### DISTRICT OF VERMONT

JUSTIN GERVAIS MILO,           :
                                :

        Plaintiff,         :
                                :

        v.                 :    Case No. 2:12-cv-124
                                :

UNIVERSITY OF VERMONT and   :
KEVIN SNEDDON,             :
                                :

        Defendants.       :

### MEMORANDUM OPINION and ORDER

This lawsuit arises from the dismissal of a student-athlete from the men's ice hockey team at the University of Vermont ("UVM"). Plaintiff Justin Gervais Milo asserts that UVM (1) breached his contract for an athletic-based financial aid scholarship for the 2010-2011 academic year; (2) by its conduct breached an implied covenant of good faith and fair dealing; and (3) deprived him of a liberty interest and due process when it dismissed him from the team. In addition, Milo asserts that UVM failed to properly supervise Defendant Head Coach Kevin Sneddon, and that Sneddon defamed him.

The Defendants have moved for summary judgment on all claims. Milo has moved to amend his complaint to add Robert Corran, UVM's Director of Athletics, as a defendant. The motion to amend, ECF No. 28, is **denied.** The motion for summary judgment, ECF No. 30, is **granted.**

### Factual Background[1]

Milo enrolled at UVM in the fall of 2007 after transferring from Cornell University where he played one season each for the varsity men's ice hockey and baseball programs.  UVM is a Division I member of the National Collegiate Athletic Association ("NCAA"), and is subject to NCAA Rules and Regulations.  Because of NCAA transfer rules, Milo was required to "redshirt" his first hockey season at UVM (2007-08), and only practiced with the team.[2]  Milo received a generally favorable player evaluation, although his coaches noted a tendency to react in frustration. In the spring of 2008 Milo played baseball for UVM.  In the fall of 2008, Milo was permitted to dress for games as a member of the men's ice hockey team.

In the 2008-09 season, Milo was named an All-Tournament honoree in UVM's Catamount Cup tournament, the men's ice hockey team reached the NCAA Frozen Four Tournament, and Milo was the team's third leading scorer.  Milo also played baseball for UVM that spring.

Twice during the 2008-09 season Milo's father, Michael Milo, requested scholarship money for his son for the 2009-10 season.

---

[1]  The following facts are undisputed except where noted.

[2]  During a redshirt year, a student-athlete may attend classes and may practice with the team, but may not play in a game.

Coach Sneddon responded that he intended to reserve scholarship money for Milo for the 2009-10 and 2010-11 seasons, although he wouldn't know the exact amount until later in 2009.  On May 30, 2009, Coach Sneddon wrote to the Milos:  "I am honored to be in a position to offer you an athletic scholarship for the next two years."  Sneddon letter, Ex. H, ECF No. 30-9.  The letter stated further that the scholarship would provide 40% of tuition/room/board/books/fees for the 2009-10 season and a full athletic scholarship for the 2010-11 season.  *Id.*

Coach Sneddon also referred the Milos to NCAA Bylaw 15.3.3 for "a full understanding of athletic scholarships."  *Id.*  Under this rule, any financial aid awarded on the basis of athletic ability may not be awarded for a period greater than one year. 2009-2010 NCAA Division I Manual ("Manual") 181, § 15.3.3, ECF No. 5-3.

Milo also received a letter from the Director of Student Financial Services ("SFS") at UVM dated June 25, 2009.  SFS letter dated 6/25/09, Ex. I-1, ECF No. 30-11.  The letter awarded him scholarship money for the 2009-10 academic year, subject to certain terms and conditions, and provided that he must be a fully matriculated student carrying a minimum of twelve credit hours per semester.  The letter also stated that the award was made for the year specified and that renewal was not automatic.

3

*Id.*

In the 2009-10 academic year Milo was a senior at UVM.  By
that year however he had used only three of his four years of
NCAA eligibility for men's ice hockey, and he intended to play
for a fifth year of college in the 2010-11 academic year, either
by pursuing a second major or by enrolling in graduate school.

In a game against the University of Massachusetts Lowell on
November 6, 2009, Milo scored the game-tying goal and was named
first star of the game.  During the holiday Catamount Cup
tournament, Milo led in scoring for the second consecutive year,
and was named its Most Valuable Player.  On January 5, 2010, Milo
was named Co-Player of the Week in the Hockey East conference for
his efforts in the Catamount Cup.  A "Player Expectations January
20-April" document created by Coach Sneddon and provided to Milo
during the week of January 20, 2010, indicated that he should
"continue your positive approach in practice and game
situations."  Sneddon Dep. Ex. 6, ECF No. 36-4.

During this period, however, UVM asserts that Coach Sneddon
asked Milo to limit public displays of frustration towards
teammates, and to improve his attitude and energy in practice.
Milo's behavior towards another player was the subject of another
discussion.  Milo was moved from the first- to the third-line
shift in December as a result.  When he responded by refusing to

4

participate meaningfully in a team drill, he was dismissed from the ice for the remainder of the practice.  Milo argued with his coaches and one of his captains in January, and refused to participate meaningfully in a review session in February.  Milo disagrees in large part with UVM's description of these events.

Milo was benched for the February 12 and 13, 2010, games and did not play.  Although Milo acknowledges that he was told he was benched, he asserts that Defendants did not provide him with any explanation.  UVM asserts that Milo's coaches informed him that he would not be playing in the games due to his continued negative attitude and poor work ethic.  *See* Gasparini Aff. ¶ 6, ECF No. 41-4.

On February 16, 2010, Coach Sneddon and two assistant coaches met with Milo and dismissed him from the team.  Coach Sneddon made the decision to dismiss Milo from the team, although he obtained input from the assistant coaches, staff and team captains, and approval from Dr. Corran, before he met with Milo. Defendants characterize the decision to dismiss Milo as "based on a culmination of incidents in which Milo demonstrated a total and unapologetic disregard for team values—namely, 'work ethic' and 'positive attitude.'"  Defs.' Statement of Undisputed Material Facts ("SUMF") 1, ¶ 2, ECF No. 30-1.  Milo states that he had no warning of behavior that would warrant his dismissal, and that

5

there was no basis for the dismissal.

At the time of his dismissal, Milo led the team in average points per game.

On February 18, 2010, Michael Milo emailed Assistant Coach John Micheletto a purported chronology of events regarding the dismissal, and sought confirmation of his facts. He added "I presume Justin's scholarship for 2010-11 will be honored. If that is not your intention, please let me know that too." Sneddon Dep. Ex. 12, ECF No. 36-4. Micheletto forwarded the email to Dr. Corran, who replied that he would not confirm or deny the details to Michael Milo, but that he and his staff would be willing to talk to Justin Milo about the decision. Corran email dated Feb. 19, 2010, ECF No. 45-3.

Milo graduated from UVM in May 2010. Between the time of his dismissal from the team and his graduation he took no steps to secure a twelve-credit course load for fall 2010. During the summer he did not contact UVM about possible enrollment in any graduate programs for the 2010-11 academic year, nor did he contact the UVM coaches about returning to the team for a final year. Nevertheless, on August 2, 2010, Michael Milo emailed Dr. Corran that he presumed Justin Milo's scholarship for the 2010-2011 academic year would be honored.

The NCAA rules with respect to renewals and nonrenewals of

financial aid based on athletic ability require an institution to determine financial aid renewal on or before July 1 before the start of the academic year for which it is awarded.  Manual 183, § 15.3.5.1.  An institution must "promptly notify in writing a student-athlete who received an award the previous academic year and who has eligibility remaining in the sport in which financial aid was awarded the previous academic year . . . whether the grant has been renewed or not renewed for the ensuing academic year."  *Id.*

In response to Michael Milo's email, UVM's SFS Director sent Justin Milo written notification of the nonrenewal of his athletic-based financial aid on August 4, 2010.  SFS letter dated Aug. 4, 2010, Ex. E, ECF No. 5-5.  The letter informed Milo that he could appeal the nonrenewal of his grant by submitting a written request within fourteen days of the date of the letter. It provided the policies and procedures for conducting the appeal, and a contact for any questions.  *Id.*  Milo did not request an appeal of the nonrenewal of his grant.

UVM has adopted a Student-Athlete Code of Conduct ("Code"). Every student-athlete must acknowledge in writing that he or she is required to know, understand and follow the standards contained in the Code, and to know, understand and follow the rules, policies, and procedures contained in UVM's Code of

7

Student Rights and Responsibilities.  The Code sets forth
standards of conduct and defines prohibited conduct to include
violation of any of several enumerated policies, including
policies regarding disrespect, poor sportsmanship, failure to
meet team obligations, and conduct unbecoming a UVM student-
athlete.  *See* Code 1-5, §§ I, III, Sneddon Dep. Ex. 1, ECF No.
36-4.

The Code provides that Head Coaches will establish team
rules to be distributed to team members, and states that "[t]he
Head Coach and the Director of Athletics each has the authority
to impose sanctions for violations of team rules, provided that
the Head Coach shall not impose the sanction of suspension or
expulsion from the team without the approval of the Director of
Athletics, or designee."  Code 6, § IV.A.  It states further that
"[f]or violations of rules and policies other than team rules
(*e.g.*, violations of NCAA rules, the Student Code of Conduct,
etc.) the Head Coach may impose sanctions with the approval of
the Director of Athletics, or designee."  *Id.*, § B.

The Code provides that when the Department of Athletics
becomes aware of an alleged violation, the Director of Athletics
or his designee "will take reasonable steps to verify the
validity, reliability, and accuracy of the report."  *Id.* at 5-6,
§ IV.  Examples of such steps may include interviews of persons

8

with relevant information.  Ordinarily a meeting with the student is convened before any sanction is imposed.  *Id.* at 6, § IV.

The Code grants a student who is suspended for a season or who is dismissed from a team the right to request an appeal.  A student's appeal letter must be submitted within three business days of the student's receiving notice of the sanction.  *Id.* at 7, § V.

On the day Milo was dismissed from the team, Coach Sneddon revealed the news at a media event and stated that the decision was made after spending "a lot of time as a staff and support staff and with the leadership."  Compl. ¶ 51.  At the same event, he stated "I think, the character, the guys that we're going with moving forward with here, the character is extremely strong. They'll give it their all every night."  *Id.* ¶ 52.  Nine days later on February 25, 2010, the Burlington Free Press ran an article quoting Coach Sneddon:

> Asked earlier in the week . . . how the Milo affair . .
> . might be affecting team morale, head coach Kevin
> Sneddon said he wouldn't respond directly.  However, he
> said, "I can say . . . that right now the energy on the
> team is very positive.  Our guys did a great job of
> doing whatever they possibly could to help the team.
> To me that's a good sign of character, that's a good
> sign of moving forward."

*Id.* ¶ 54.  In a later online edition article, the Burlington Free Press ran an article entitled "The Milo Cause-and-Effect:  Is It

Real?"  The article stated:

> Earlier this week, Sneddon would not comment on the
> effect of Milo's dismissal on team morale, but after
> Friday's win, he said, "Right now, the strength of our
> character is really shining.  The guys, through
> adversity . . . I think they're getting stronger as a
> unit, pulling together, trying to get it done."

*Id.* ¶ 55.

## DISCUSSION

## I.  Motion to Amend

On February 12, 2013, Milo moved to amend his complaint,

seeking to add Dr. Corran as a defendant.  Specifically, Milo

moved to add claims that Dr. Corran denied him a right to appeal

his dismissal and defamed him in an email exchange with the coach

of the Holland National Hockey Team.[3]  The motion is denied.

The deadline for joinder of parties and amendments to

pleadings under the Amended Stipulated Discovery Schedule/Order

expired on December 3, 2012.  Am. Stipulated Disc. Schedule/Order

¶ 9, ECF No. 21.  In general, courts should "freely give leave

[to amend the complaint] when justice so requires."  Fed. R. Civ.

P. 15(a)(2).  However, that lenient standard "must be balanced

against the requirement under Rule 16(b) that the Court's

---

[3]   On May 29, 2011, Dr. Corran received an email inquiry from the coach of
the Holland National Hockey Team concerning the possibility of Milo playing
for the team.  Mot. to Am. Compl. ¶ 4, ECF No. 28.  Corran responded that Milo
"had a questionable history since leaving us . . . you should be careful if
you decide to take him."  *Id.*

scheduling order 'shall not be modified except upon a showing of good cause.'" *Holmes v. Grubman*, 568 F.3d 329, 334-35 (2d Cir. 2009) (quoting *Grochowski v. Phoenix Constr.*, 318 F.3d 80, 86 (2d Cir. 2003)).  "Whether good cause exists turns on the 'diligence of the moving party.'"  *Id.* at 335 (quoting *Grochowski*, 318 F.3d at 86).

Appropriate diligence warranted seeking to amend the complaint prior to the deadline.  Although Milo contends that he was unaware of the grounds for amendment until depositions were conducted in January 2013, Milo received a copy of the email exchange in discovery in September 2012, nearly three months before the December 2012 deadline for joinder of parties and amendment of pleadings.

Milo contends that he did not know that Dr. Corran had no basis for stating that Milo had a questionable history since leaving UVM until Dr. Corran was deposed in January 2013.  Milo himself, however, knew in September whether there was a basis for the comment.  If the comment—to the extent that it implied knowledge of facts of a disparaging nature—lacked a factual basis, Milo was aware of the facts of his subsequent history.  If the comment was based in fact, then it was not actionable.

Milo has shown neither good cause nor exceptional circumstances warranting an extension of the discovery deadline,

and the motion to amend complaint is denied.

## II.  Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it could affect the outcome of the lawsuit; a dispute is genuine if a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc*, 477 U.S. 242, 247-48 (1968).  Although the Court must draw all inferences from the facts in the light most favorable to the non-moving party, that party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir. 1986).  Once the moving party has met its burden, to preclude summary judgment the non-moving party must "set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 255.

## A.  Breach of Contract (Count I)[4]

### 1.  Based on the Student-Athlete Code of Conduct

The parties agree that Vermont law recognizes that the relationship between a student and a college is contractual in

---

[4]  The parties agree that the substantive law of Vermont applies to the state law claims in this suit.  *See Knelman v. Middlebury Coll.*, 898 F. Supp. 2d 697, 708 (D. Vt. 2012).

12

nature.  *See Knelman v. Middlebury Coll.*, 898 F. Supp. 2d 697, 708 (D. Vt. 2012); *Reynolds v. Sterling Coll., Inc.*, 750 A.2d 1020, 1022 (Vt. 2000) (entry order) (citing *Merrow v. Goldberg*, 672 F. Supp. 766, 774 (D. Vt. 1987)).  The terms of such a "'contract are contained in the brochures, course offering bulletins, and other official statements, policies and publications of the institution.'"  *Id.* (quoting *Merrow*, 672 F. Supp. at 774).  The parties also do not dispute that Milo did not have an absolute contractual right to play ice hockey at UVM.

Milo contends that the provisions of the Code were terms of a contract between himself and UVM and that UVM violated this contract when it dismissed him.  UVM does not contest that the Code may form part of a contract between it and a student-athlete.  It argues rather that Milo's dismissal was not based on any provisions of the Code, but was a "coaching decision within Coach Sneddon's sound discretion, made after consultation with and approval by . . . Dr. Corran."  Defs.' Mot. for Summ. J. 7, ECF No. 30.  According to UVM, Milo was dismissed for unrepentant negative attitude and poor work ethic in practices, which it contends does not constitute prohibited conduct covered by the Code.

In addition to disputing whether he was guilty of these offenses, Milo argues that the conduct as alleged would be

prohibited under the Code either as "failure to meet team obligations" or "conduct unbecoming a UVM student-athlete," or as a violation of Coach Sneddon's team rules.  Code 5-6, §§ III.N, O, IV.A.  Although this Court finds it difficult to distinguish the conduct Milo was accused of from conduct prohibited under the Code, it is also mindful of the deference to be accorded academic officials' interpretation of their own policies.  *See Fellheimer v. Middlebury Coll.*, 869 F. Supp. 238, 243 (D. Vt. 1994).  It is unnecessary to resolve this issue, however.

Regardless of whether Milo's alleged conduct was prohibited under the Code, the Code provides that a student-athlete who is subject to season-long suspension or expulsion from a team may appeal these sanctions.  It does not confine the student's appeal rights to conduct that is specifically prohibited by the Code; in plain language it accords an appeal right based on the severe sanction imposed, not on the conduct that may have justified the sanction.  The vigorously contested reasons for Milo's dismissal do not create a dispute of material fact if Milo failed to avail himself of his right to appeal his dismissal.

It is undisputed that Milo did not submit a written request for an appeal within three business days of February 16, 2010, or February 19, 2010.  It is also undisputed that Milo had initialed each section of the Code on October 26, 2009, signifying that he

14

had read and understood its provisions, including the appeal
rights set forth in section V.  *See* Milo copy of Code, SUMF Ex.
L, ECF No. 30-15.

Milo states that UVM's senior associate athletic director
Jeff Shulman told him after his dismissal that he did not have
the right to appeal the decision.  Milo Aff. ¶ 7, ECF No. 36-6.
Milo spoke with Shulman over the telephone on the day of his
dismissal and again in person on March 2.  *See* Shulman email
dated Mar. 2, 2010, ECF No. 30-18.  In the first conversation
Shulman told Milo he would look into the dismissal.  In the March
2 conversation Shulman, after speaking with Dr. Corran, told Milo
that there was nothing Milo could do about it.  *See* Milo Dep.
71:5-72:2, Dec. 7, 2012, ECF No. 30-5.

Although Dr. Corran believed that Milo was not entitled to
an appeal under the Code, the undisputed facts show that this
belief was not communicated to Milo within the window afforded to
request an appeal.  Milo was on notice that he could appeal a
dismissal from the team and did not attempt to do so.  He argues
now that attempting to appeal the decision would have been
futile, but his speculation does not form the basis for a
complaint that UVM breached contractual requirements.

Milo also suggests that his father's February 18, 2010
"chronology" email to Assistant Coach Micheletto qualified as an

15

appeal.  This email did not come from Milo, did not purport to appeal the decision to dismiss him, and did not supply grounds for the appeal.  No one at UVM receiving this communication could reasonably have construed it as an attempt by Milo to appeal his coach's decision to dismiss him from the team.

Finally, Milo objects that UVM failed to conduct an adequate investigation of the conduct forming the basis for the dismissal. Although the Code requires the Director of Athletics to take reasonable steps to verify the validity, reliability and accuracy of a report of a violation of the Code, no particular procedure is mandated.  Under the circumstances, Dr. Corran's reliance on the judgment of his head coach does not constitute a violation of any provision of the Code.

UVM is entitled to summary judgment on Milo's claim that UVM breached a contract with him by failing to comply with the policies and procedures set forth in the Code.

### 2.   Based on the Nonrenewal of the Athletic Scholarship

Milo claims that UVM offered and Milo accepted a 100% athletic-based financial aid scholarship for the 2010-11 academic year.  Taking the facts in the light most favorable to Milo, he was not offered an athletic scholarship for the 2010-11 academic year, and therefore his claim that UVM did not timely notify him of the nonrenewal of his scholarship cannot form the basis for a

breach of contract claim.  Moreover, by the 2010-11 academic
year, Milo was not enrolled at UVM and was not eligible for an
athletic-based scholarship.

Milo argues that Coach Sneddon's May 30, 2009 letter was an
offer of scholarship aid for both the 2009-10 academic year and
the 2010-11 academic year.  The letter stated that he was "in a
position to offer you an athletic scholarship for the next two
years," and stated that the amount would be 40% in 2009-10 and a
full scholarship in 2010-11.  Sneddon letter, ECF No. 30-9.  The
letter referred Milo to NCAA By-law 15.3.3 "in order to gain a
full understanding of athletic scholarships."  *Id.*  Under this
rule, any financial aid awarded on the basis of athletic ability
may not be awarded for more than one year at a time.

Milo has argued that student-athletes at UVM are entitled to
the protections of the NCAA Division I rules.  He has not
explained why the rule against multiple year awards should not
apply to him, nor has he argued that he was unaware of the rule.
Moreover, Milo received a letter from UVM's SFS Director on June
25, 2009, that explicitly offered him a $16,066 plus books
Athletics Grant-in-Aid for the 2009-2010 academic year.  That
letter provided details of how the payments were to be made, and
conditioned the award on his being a fully matriculated student
carrying a minimum of twelve credit hours per semester.  The

17

letter stated that the award was made for the year specified and that renewal was not automatic.  It stated that "[a]n award is not final until [UVM] receives your internet acceptance."  SFS letter dated 6/25/09, ECF No. 30-11.  And it stated that by accepting the scholarship Milo acknowledged that he had read, fully understood and would comply with the terms and conditions of the letter.  *Id.*

Milo does not dispute that he accepted the 2009-10 award under the terms and conditions of the SFS Director's letter, nor does he claim that he was unaware of the terms and conditions contained in the letter.  Given these undisputed facts there is no basis for a claim that UVM offered and Milo accepted an offer for an athletic-based scholarship for the 2010-2011 academic year.  *See, e.g.*, *Starr Farm Beach Campowners Ass'n, Inc. v. Boylan*, 811 A.2d 155, 158 (Vt. 2002) (entry order) ("An enforceable contract must demonstrate a meeting of the minds of the parties:  an offer by one of them and an acceptance of such offer by the other. . . . '[A] mere expression of intention or general willingness to do something . . . does not amount to an offer.'") (quoting *Searles v. Trustees of St. Joseph's Coll.*, 695 A.2d 1206, 1212 (Me. 1997)).

Milo also argues that UVM missed the deadline set by the NCAA for notification of nonrenewal of athletic scholarships.

18

Assuming without deciding that NCAA rules are incorporated into the scholarship contracts between student-athletes and their schools, Milo has not demonstrated that he was otherwise eligible for an athletic scholarship from UVM at the time the NCAA set for notification of nonrenewal. As of July 1, 2010, Milo had been dismissed from the team, and had graduated from UVM. He had given no indication following his dismissal from the team that he was or intended to become eligible to receive a 2010-11 athletic scholarship. In order to be eligible he would have had to have been a fully matriculated student enrolled in a degree program and carrying a minimum of twelve credit hours. There is no evidence that Milo made any effort to become enrolled at UVM for the 2010-11 academic year. The communications from Milo's father in February and August 2010 neither sought reconsideration of Milo's dismissal from the team nor sought to reestablish his eligibility for an athletic-based financial aid for the 2010-1011 academic year. Milo has not suggested that any of his own communications with UVM personnel after his dismissal dealt with maintaining or restoring eligibility for the 2010-11 season.

The failure to send a timely notice of nonrenewal of an athletic-based scholarship to a graduated former member of an athletic team—if a violation of NCAA rules—does not signify that the student therefore has an agreement with his school to receive

19

a scholarship for which he would not have been eligible had the notice of nonrenewal been timely sent.

Because as a matter of law Milo never had a contract with UVM for a financial aid scholarship for the 2010-11 academic year; and because Milo cannot establish breach of contract based on UVM's failure to comply with its policies and procedures when it dismissed Milo from the men's ice hockey team given Milo's failure to appeal the dismissal, UVM is entitled to summary judgment on the breach of contract portion of Count I of Milo's Complaint.

**B.   Breach of a Covenant of Good Faith and Fair Dealing (Counts I & III)**

Milo alleges that UVM breached the covenant of good faith and fair dealing implied in all contracts when Coach Sneddon dismissed Milo from the men's ice hockey team and UVM did not renew his athletic scholarship.

"A cause of action for breach of the covenant of good faith can arise only upon a showing that there is an underlying contractual relationship between the parties." *Monahan v. GMAC Mortg. Corp.*, 2005 VT 110, ¶ 54 n.5, 893 A.2d 298, 316 n.5. Although the question of whether a party has acted in good faith ordinarily is fact-dependant, "summary judgment will be granted 'where the nonmoving party cannot show how the other undermined

or destroyed [his] rights under the contract.'" *Knelman*, 898 F. Supp. 2d at 716 (quoting *Howard Opera House Assocs. v. Urban Outfitters, Inc.*, 166 F. Supp. 2d 917, 934 (D. Vt. 2001)).

UVM is entitled to summary judgment on Milo's breach of contract claim.  Nevertheless, "[a]n underlying principle implied in every contract is that each party promises not to do anything to undermine or destroy the other's rights to receive the benefits of the agreement." *Carmichael v. Adirondack Bottled Gas Corp. of Vt.*, 635 A.2d 1211, 1216 (Vt. 1993).  Activity occurring after the termination of a contract may be subject to good faith and fair dealing, *see id.* at 1217, and breach of an underlying contract is not a prerequisite for an action alleging breach of the covenant.  *See Monahan*, 2005 VT 110, ¶ 54 n.5, 893 A.2d at 316 n.5.

Thus even though UVM is entitled to summary judgment on Milo's breach of contract claim, the parties owed each other a duty of good faith and fair dealing in conduct related to their contractual relationship.  Conduct demonstrating a lack of good faith or fair dealing is conduct that violates "'community standards of decency, fairness or reasonableness.'" *Southface Condominium Owners Ass'n, Inc. v. Southface Condominium Ass'n, Inc.*, 733 A.2d 55, 58 (Vt. 1999) (quoting *Carmichael*, 635 A.2d at 1216).

21

Milo has not pointed to any specific conduct from which a reasonable jury could conclude that UVM undermined or destroyed his rights under a contract.  Milo was shocked by his dismissal from the team, and believes that the decision lacked justification, but he does not supply facts that could support a finding of bad faith or wrongdoing.  Milo claims he was led to believe he could not appeal the dismissal.  If a jury were to credit this claim, and find that this demonstrated bad faith, it still would not be able to conclude that this conduct undermined any contractual rights, given that the time for appeal allegedly accorded under the contract had already lapsed.  That UVM did not send a notice of nonrenewal to a former student-athlete is hardly remarkable, much less evidence of bad faith.  In sum, the numerous factual disputes Milo identifies, taken in the light most favorable to him, simply do not amount to conduct that violates community standards of decency, fairness or reasonableness.[5]

---

[5]  As Milo puts it,

> The disputed issues with respect to the dismissal include (1) whether Milo was dismissed based on long-term concerns or recent events . . .; (2) whether Milo was given any notice that he was on the verge of being dismissed; (3) whether Coach Sneddon provided Corran with any support for his decision to dismiss Milo; (4) whether Corran did any investigation as required by the Code; (5) whether Corran had any basis to conclude that the Code did not apply to Milo's dismissal . . .[; and] (6) whether Defendants acted in good faith.

Pl.'s Opp'n to Defs.' Mot. for Summ. J. 8, ECF No. 36.  *See also id.* at 19 (stating conclusorily that "[b]ecause there are numerous factual issues concerning good faith and fair dealing relative to Milo's dismissal, the Court

Accordingly, UVM is entitled to summary judgment on Counts I and III.

## C.   Section 1983 Claim (Count II)

Milo makes two distinct claims under § 1983.  First, he asserts that dismissal from the UVM hockey team without notice or hearing deprived him of due process rights secured by the Fourteenth Amendment of the United States Constitution.  Compl. ¶ 88.  Second, he asserts that Coach Sneddon made defamatory statements which violated Milo's liberty interests.  *Id.*

"The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property."  *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569 (1972).  "To have a property interest in a benefit, a person clearly must more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  *Id.* at 577.

The parties dispute whether Milo had a legitimate entitlement to and therefore a constitutionally-protected interest in his participation in a college sports team, but it is unnecessary to resolve this question.  Assuming for the sake of argument that he had a constitutionally protected property

─────────────────

should deny summary judgment").

interest in playing on the hockey team, Milo's procedural due
process claim founders because Milo failed to avail himself of
the process provided for challenging a dismissal from the team.

"The constitutional violation actionable under § 1983 is not
complete when the deprivation occurs; it is not complete unless
and until the State[6] fails to provide due process.  Therefore, to
determine whether a constitutional violation has occurred, it is
necessary to ask what process the State provided, and whether it
was constitutionally adequate." *Zinermon v. Burch*, 494 U.S. 113,
126 (1990).

Milo does not claim that the Code sets forth
constitutionally inadequate process in its provisions for
investigation of student-athlete misconduct and appeal of
student-athlete sanctions.  As discussed above, under the Code
the process for investigation is entrusted to the discretion of
the athletic director.  And Milo, on notice of his appeal rights,
failed to attempt to appeal his dismissal.  Although Milo has
produced some evidence that school officials did not believe he
was entitled to due process protection in connection with his
dismissal from the team, he has pointed to no evidence indicating
that this belief was communicated to him within the time frame

---

[6]  UVM apparently concedes that it is a state actor for purposes of this due
process analysis.  *See, e.g.*, *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 744
(2d Cir. 2003).

provided for the appeal, or that he was otherwise prevented or discouraged from appealing.  On these undisputed facts, Milo cannot show that he was denied due process.

With respect to the allegedly defamatory statements, one's reputation alone is neither "liberty" nor "property" "sufficient to invoke the procedural protection of the Due Process Clause." *Paul v. Davis*, 424 U.S. 693, 701 (1976); *accord Patterson v. City of Utica*, 370 F.3d 322, 329-30 (2d Cir. 2004).  Milo's complaint arguably makes a "stigma plus" or "defamation plus" claim, defamatory statements plus a deprivation of a tangible interest, his participation on the ice hockey team.  *See Algarin v. Town of Wallkill*, 421 F.3d 137, 138 n.1 (2d Cir. 2005) (noting the use of the phrase).  Assuming, as discussed above, that Milo had a constitutionally protected interest in participating in the ice hockey team, he has not made out a viable stigma plus claim.

The allegedly defamatory conduct took place after Milo had been dismissed from the team.  *See* Compl. ¶¶ 51-52, 54-55.  A stigma plus claim requires first a showing that the state actor made stigmatizing statements about the plaintiff—"statements that call into question plaintiff's 'good name, reputation, honor, or integrity.'" *Patterson*, 370 F.3d at 330 (quoting *Quinn v Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 446 (2d Cir. 1980)). Statements that denigrate a plaintiff's competence and

professional reputation so as to significantly hamper the plaintiff's continued ability to practice a profession may satisfy this requirement.  *Id.*

The comments made by Coach Sneddon do not support a stigma plus claim because they are not defamatory, as discussed below.[7]

Because Milo was not denied procedural due process with respect to his dismissal from the ice hockey team, and because he has no viable stigma plus claim, UVM is entitled to summary judgment on Count II of the Complaint.

**D.   Defamation Claim**

Milo claims that Coach Sneddon's comments to the press constitute defamation.  In Vermont, the elements of defamation are: "'(1) a false and defamatory statement concerning another; (2) some negligence, or greater fault, in publishing the statement; (3) publication to at least one third person; (4) lack of privilege in the publication; (5) special damages, unless actionable per se; and (6) some actual harm so as to warrant compensatory damages.'"  *Russin v. Wesson*, 2008 VT 22, ¶ 5, 949 A.2d 1019, 1020 (quoting *Lent v. Huntoon*, 470 A.2d 1162, 1168

---

[7] There must also be a temporal link between the alleged defamation and the dismissal. *See, e.g.*, *Martz v. Inc. Vill. of Valley Stream*, 22 F.3d 26, 32 (2d Cir. 1994).  Thus Dr. Corran's comment to the Holland team coach—if defamatory, and admissible in this case despite the denial of the motion to amend—cannot form a stigma plus claim because the exchange took place more than a year after the dismissal.  *See id.* (dismissing claim for lack of nexus between defamation and termination from employment five months earlier).

(Vt. 1983)); *accord Wilkinson ex rel. Wilkinson v. Russell*, 182 F.3d 89, 99 (2d Cir. 1999).

None of Coach Sneddon's statements identified by Milo constitute a false and defamatory statement concerning another. "A communication is defamatory 'if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'" *Weisburgh v. Mahady*, 511 A.2d 304, 306 (Vt. 1986) (quoting Restatement (Second) of Torts § 559 (1977)); *accord Knelman*, 898 F. Supp. 2d at 722-23. True statements are not defamatory because the truth is a complete defense to defamation. *Russin*, 2008 VT 22, ¶ 5, 949 A.2d at 1020.

Only one statement of Sneddon's directly refers to Milo. Coach Sneddon stated publicly that he had just spoken to Milo about the decision to dismiss him from the team and that the decision to dismiss Milo was made after spending "a lot of time as a staff and support staff and with the leadership." Compl. ¶ 51. The truth of this fact is undisputed and it is therefore not defamatory.

The remainder of Coach Sneddon's comments to the press do not refer to Milo. Milo regards the comments as "easily understood as intended to denigrate Milo's character and work ethic." Opp'n to Defs.' Mot. for Summ. J. 23, ECF No. 36. The

27

statements consistently refer to the team, their character, their energy, their performance, their progress, their "pulling together, trying to get it done." Compl. ¶¶ 52-53, 54-55. The statements are expressions of opinion that the team was and would continue to be performing well. Coach Sneddon deliberately refrained from any comment that could be construed as referring to Milo. An expression of optimism that the team was energetically moving forward, combined with praise for the team's character, cannot reasonably be construed as implying knowledge of facts that would disparage a former team member's character or work ethic.

UVM is therefore entitled to summary judgment on Count V.

**E.   Negligent Supervision**

Finally, Milo alleges that UVM knew or should have known, through Dr. Corran, of the tortious acts Coach Sneddon inflicted upon Milo. Compl. ¶ 97. An employer cannot be vicariously liable where the plaintiff cannot show that any of its employees engaged in tortious conduct. *Haverly v. Kaytec, Inc.*, 738 A.2d 86, 91 (Vt. 1999) ("[T]he tort of negligent supervision must include as an element an underlying tort or wrongful act committed by the employee."). Because Milo's tort claims do not survive summary judgment, a claim against UVM for negligent supervision must also fail.

28

**CASE CLOSED**

Dated at Burlington, Vermont, this 29th day of August, 2013.

/s/ William K. Sessions III
William K. Sessions III
District Court Judge
